UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DAVID SHARROW,

                Plaintiff,                            Case No. 17-cv-11138

v.                                                      Honorable Thomas L. Ludington

S.C. JOHNSON & SON, INC.,

                Defendants.
_____/

## **OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On April 11, 2017, Plaintiff David Sharrow ("Plaintiff") filed a complaint against Defendant S.C. Johnson & Son, Inc. ("Defendant" or "SCJ"), alleging that Defendant wrongfully terminated his employment at Defendant's Ziploc Slide-Loc Plant located in Bay City, Michigan. ECF No. 1. Plaintiff alleges that he was termination in retaliation for exercising his rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C § 2601 et seq. (Count I), for exercising his rights under the Michigan Worker's Disability Compensation Act ("MWDCA" or "WDCA") (Count II), and because of his disability in violation of the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA") (Count III). *Id.* After seven months of discovery, Defendant moved for summary judgment on February 8, 2018. ECF No. 10. Plaintiff responded on March 1, 2018, and Defendant replied on March 15, 2018. ECF Nos. 15, 17.

**I.**

Plaintiff began working for Defendant in 1999 as an Associate Technician. Sharrow Dep. at 24, ECF No. 10-9. He was eventually promoted to Senior Technician. *Id.* "During 2015 up until November 20, 2015," Association Production Manager Brigitte Nestle was Plaintiff's direct

supervisor. Nestle Aff. ¶ 3, ECF No. 10-3. Ms. Nestle was Plaintiff's direct supervisor when he requested FMLA leave in July of 2015, and Robert Pratcshler was his Team Leader. Sharrow Dep. ¶ 27, 29. At the time of Plaintiff's termination, Interim Production Manager Pete Brissette was Plaintiff's direct supervisor. Brissette Aff. ¶ 4, ECF No. 10-4. In early July, 2015, Plaintiff began experiencing foot pain while at work. Sharrow Dep. at 41–42. Plaintiff was also suffering from a chronic knee condition. *Id.* at 30. Plaintiff requested sick leave from July 11 through approximately July 27. Sharrow Dep. at 48; ECF No. 15-8. On July 15, 2015, Plaintiff visited his physician Charles E. Kerr, D.O., and was diagnosed with a sesamoid fracture in his foot. *Id.* Dr. Kerr gave Plaintiff a note indicating he would be "off work 7/11 until 7/27 due to health problems." ECF No. 15-4. On July 16, 2018, Plaintiff visited Sheri Wenglikowski, R.N., in Defendant's medical department, gave her the Doctor's note, and informed her he was having issues with his knee and toe. ECF No. 15-3. He also filled out a request for FMLA leave. *Id.*; ECF No. 15-5.

The weekend of July 17, 2015, Plaintiff attended a charity golf tournament. *See* ECF No. 15-8. Plaintiff appeared in a Facebook picture on July 19, 2015, with three other individuals captioned "2015 Tim and Ed's Golf Scramble Champs." *Id.*; Resp. at 4. The picture was brought to Ms. Nestle's attention on July 20, 2015. Ms. Nestle called the golf course and spoke with an employee who confirmed that the golf scramble took place the weekend of July 17. On July 25, 2018, Plaintiff appeared in a Facebook post captioned "Tubing the Rifle River." ECF No. 15-8. This Facebook post was brought to Ms. Nestle's attention on July 28, 2015. *Id.* On July 29, 2015, Dr. Kerr provided a return to work slip indicating the Plaintiff could return to work with no restrictions, and Plaintiff returned to work that same day. ECF No. 15-10. On September 11, 2015, Plaintiff's FMLA request was denied. ECF No. 15-14.

On September 16, 2015, Ms. Nestle and Senior Human Resources Associate Anna Bluj met with Plaintiff. ECF No. 15-8. They questioned him about various activities he was and was not able to do during his time off due to his medical condition. Sharrow Dep. at 51–56. He told them it was difficult to walk and climb stairs. *Id.* at 52. They also showed him the picture from the golf outing and questioned him about his attendance. *Id.* at 55. On September 24, 2015, Ms. Nestle prepared a memorandum of this investigation. ECF No. 15-8. The memorandum indicates that Plaintiff admitted to Ms. Nestle and Ms. Bluj that he "participated in the tournament." *Id.* He told them he had also tubed down the rifle river. *Id.* at 60.

Plaintiff testified that the event consisted of nine holes of golf, and that he rode in the cart all day long "other than to walk up and watch them putt or something . . ." *Id.* at 49. Plaintiff did not, however, confirm or deny that he told Ms. Nestle and Ms. Bluj that he participated. He testified that his job duties as a technician consisted of: "Adjusting Plastic, knowing the – just a lot of adjustments, a lot of adjustments, a lot of thinking and a lot of physically running up and down stairs, a lot of climbing in the machines, and scraping wires, a lot – a lot more physically and having knowledge of the machines themselves." *Id.* at 61.

Based on the interview with Plaintiff, Ms. Nestle determined that Plaintiff's explanation of his physical limitations was inconsistent with his activities during his sick leave, and recommended that the company place Plaintiff on Decision Making Leave (DML). ECF No. 15-8. On October 9, 2015, Ms. Nestle provided Plaintiff a memorandum placing Plaintiff on DML for "Sick Benefit Fraud Violation." ECF No. 15-15. The memorandum also provided as follows:

> During your Decision Making Leave you will need to consider whether you wish to maintain your employment with the Company. Upon your return from leave, you must provide me with a commitment letter and action plan stating specifically how you will improve your behavior, specifically as it relates to adherence to and leadership around Integrity, and SCJ Absence Policies and Procedures. This plan must be acceptable to me, Greg Velez, and Jessica Whittaker. If you fail to

> provide an acceptable action plan, your employment will be terminated . . . If your letter and action plan are acceptable, this DML and action plan *will remain in effect until October 9, 2016. Any additional work performance issues during this time, including attendance, safety, quality, Relationship Imperatives, and work practices will result in termination per the Positive Discipline Guidelines.*

*Id.* On October 19, 2015, Plaintiff submitted his commitment letter and action plan, as required. ECF No. 15-16, 15-17. The action plan was deemed acceptable, and was memorialized in a memo from Ms. Nestle to Plaintiff on November 11, 2015. ECF No. 15-17.

On November 22, 2015, Plaintiff was placed on administrative leave after Team Leader Robert Pratcschler accused Plaintiff and his co-worker, Jasun Dzurka, of sleeping on the job. ECF No. 15-19, 15-20. Ms. Bluj issued a memorandum on December 1, 2015, indicating that she and Plaintiff's supervisor Mr. Brissette conducted an investigation of the alleged violation. ECF No. 15-20. They interviewed Plaintiff, reviewed a photograph taken by Mr. Pratcschler, and determined that Plaintiff had been sleeping on the job. *Id.* They also determined that Plaintiff had lied when he denied sleeping on the job in the interview. *Id.* On December 3, 2015, Mr. Brissette provided Plaintiff a letter informing him that his employment was terminated for "inattention to job duties; sleeping on the job; as well as lying regarding this incident in a company investigation." ECF No. 15-20. Because Mr. Sharrow was already at the Decision Making Leave (DML) stage of discipline, the next step was termination. Plaintiff testified that, during his interview with Mr. Brissette and Ms. Bluj, he denied sleeping on the job and denied nodding off. Sharrow Dep. at 86-87. Mr. Dzurka, Plaintiff's co-worker, was also at the DML stage of discipline prior to the sleeping infraction, and was also terminated. Brissette Aff. ¶ 17, ECF No. 10-4.

**II.**

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). "The party opposing summary judgment cannot rest on its pleading or allegations, to prevail, they must present material evidence in support of their allegations." *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007) (citing *Celotex Corp v. Catrett*, 477 U.S. 317 (1986)). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

**III.**

The Family and Medical Leave Act (FMLA) makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," or to retaliate or discriminate against an employee for doing so. 29 U.S.C.A. § 2615(a)(1)-(2). "Absent direct evidence of unlawful conduct, FMLA-retaliation claims are evaluated according to the tripartite burden-shifting framework announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)." *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007).

**A.**

To establish a prima facie case of FMLA retaliation, a plaintiff must show "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

Here, only the second and fourth elements of Plaintiff's prima facie case are in dispute, namely whether Defendant knew Plaintiff was exercising his rights under the FMLA and whether there was a causal connection between the protected activity and the adverse decisions. Plaintiff argues he has met his prima face case because: 1) Defendant committed several violations of the FMLA in its handling of his application; 2) the protected activity and the adverse decision were only a few months apart; 3) Mr. Pratcshler began following him around and watching him after he asserted his FMLA rights. Resp. at 15–17.

Plaintiff argues that Defendant committed the following violations of the FMLA in its handling of his application: 1) Defendant failed to designate Plaintiff's leave as FMLA-qualifying, even though he provided sufficient information to establish his entitlement; 2) Defendant improperly sought information outside the scope of the certification form; and 3) Defendant did not provide Plaintiff an opportunity to cure any deficiencies. Resp. at 15.

Plaintiff's arguments concerning the handling of his FMLA application sound in an entitlement theory, not a retaliation theory. Sixth Circuit precedent recognizes these as two distinct theories of recovery for FMLA wrongdoing. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). The "entitlement" or "interference" theory arises from § 2615(a)(1), which prohibits an employer from interfering with an employee's exercise of her FMLA rights or

wrongfully denying those rights, and requires the employer to restore the employee to the same or an equivalent position upon her return from FMLA leave. *Id.* The "retaliation" theory, on the other hand, arises from § 2615(a)(2), which prohibits an employer from taking any adverse action against an employee for exercising or attempting to exercise her rights under the Act. *Id.*

Plaintiff's arguments regarding his entitlement/interference theory are not supported by any citation to the evidentiary record. In fact, they are largely belied by the evidentiary record. Additionally, Plaintiff has never asserted an interference/entitlement claim, nor has he sought leave to amend his complaint. He may not assert this claim for the first time in a response brief to Defendant's motion for summary judgment. Furthermore, Plaintiff offers no explanation as to how these alleged acts of interference are probative of retaliatory intent.

Plaintiff also notes that the adverse decisions occurred only a few months after his request for FMLA leave. Temporal proximity between the leave request and the adverse decision can raise an inference of retaliatory intent sufficient to establish a prima facie case. *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (holding that the three-month time lapse between the plaintiff's request for FMLA leave and her termination on the day she was scheduled to return to work established a causal connection at the prima facie stage); *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012). Here, Plaintiff requested FMLA leave on July 16, 2015. ECF No. 15-5. On September 11, 2015, Plaintiff's FMLA request was denied. ECF No. 15-14. On September 16, 2015, Ms. Nestle and Senior Human Resources Associate Anna Bluj interviewed Plaintiff in conjunction with their investigation of his conduct during his time off. ECF No. 15-8. On September 24, 2015, Ms. Nestle prepared a memorandum of this investigation and recommended that the company place Plaintiff on Decision Making Leave (DML). ECF No. 15-8. On October 9, 2015, Plaintiff was placed on DML for "Sick Benefit

Fraud Violation." ECF No. 15-15. On November 22, 2015, Plaintiff was placed on administrative leave after Team Leader Mr. Pratcschler accused Plaintiff and his co-worker, Jasun Dzurka, of sleeping on the job. ECF No. 15-19, 15-20. On December 3, 2015, Mr. Brissette provided Plaintiff a letter informing him that his employment was terminated. ECF No. 15-20.

Thus, there was a close temporal nexus between Plaintiff's assertion of his FMLA rights and the adverse decisions. Within two months of his FMLA request, and within one week after his application was decided, he was investigated for wrongdoing. He was placed on DML within three weeks thereafter, and terminated within two months of being placed on DML. Given the relatively light burden of proof imposed on Plaintiff at this stage, he has furnished sufficient evidence of a causal connection.

Defendant asserts that temporal proximity is insufficient to establish a prima facie case. Defendant offers no legal authority for this proposition, and does not address the substantial legal authority to the contrary. Defendant notes that Plaintiff had previously been granted FMLA leave during his employment at SCJ, but does not explain how this negates the circumstantial evidence of retaliation for this particular FMLA request.

Defendant notes that Mr. Brissette, the supervisor who made the decision to terminate Plaintiff, had no knowledge of Plaintiff's FMLA request. Mot. at 19 (citing Brissette Aff. at ¶ 18, ECF No. 10-4.). Defendant therefore contends that Plaintiff cannot meet the second element of his prima facie case. This overlooks the other adverse decision at issue, namely the decision to place Plaintiff on DML. Indeed, DML was the final stage of the positive discipline process short of termination, and any infraction committed while an employee was on DML resulted in automatic termination. ECF No. 15-15. Ms. Nestle, and not Mr. Brissette, was responsible for the

decision to place Plaintiff on DML. ECF No. 15-8, 15-15. Ms. Nestle was aware of Plaintiff's FMLA request. Nestle Aff. at 10, ECF No. 10.3. Thus, Plaintiff has established each element of his prima facie case.

**B.**

Once the plaintiff has carried its burden to establish a prima facie case of FMLA retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). To carry this burden, a defendant "must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful [retaliation] was not the cause of the employment action." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07) (citations and quotations omitted).

Here, Defendant has offered a legitimate, non-retaliatory reason for placing Plaintiff on DML and for terminating him. Plaintiff was out on sick leave from July 11 to July 27 with knee problems and a sesamoid fracture in his foot. Plaintiff appeared in a Facebook picture on July 19, 2015 with three other individuals captioned "2015 Tim and Ed's Golf Scramble Champs." The picture was brought to Ms. Nestle's attention on July 20, 2015. ECF No. 15-8. Ms. Nestle called the golf course and spoke with an employee who confirmed that the golf scramble took place the weekend of July 17, a weekend Plaintiff would have otherwise been scheduled to work. *Id.* On July 25, 2018, Plaintiff appeared in a Facebook post captioned "Tubing the Rifle River." ECF No 15-8. This Facebook post was brought to Ms. Nestle's attention on July 28, 2015. *Id.* On September 16, 2015, Ms. Nestle and Senior Human Resources Associate Anna Bluj met with Plaintiff. ECF No. 15-8. They questioned him about various activities he was and was not able to do during his time off due to his medical condition. Sharrow Dep. at 51–56. He told them it was

difficult to walk and climb stairs. *Id.* at 52. They also showed him the picture from the golf outing and questioned him about his attendance. *Id.* at 55. On September 24, 2015, Ms. Nestle prepared a memorandum of this investigation. ECF No. 15-8. The memorandum indicates that Plaintiff admitted to Ms. Nestle and Ms. Bluj that he "participated in the tournament." *Id.* He told them he had also tubed down the rifle river. *Id.* at 60.

Based on the facebook posts and the interview with Plaintiff, Ms. Nestle determined that Plaintiff's activities during sick leave were inconsistent with his reasons for being out on sick leave, and recommended that the company place Plaintiff on DML. ECF No. 15-8. On October 9, 2015, Ms. Nestle provided Plaintiff a memorandum placing Plaintiff on DML for "Sick Benefit Fraud Violation." ECF No. 15-15.

On November 22, 2015, Plaintiff was placed on administrative leave after Team Leader Mr. Pratcschler accused Plaintiff and his co-worker, Jasun Dzurka, of sleeping on the job. ECF No. 15-19, 15-20. Ms. Bluj and Plaintiff's supervisor, Mr. Brissette, conducted an investigation of the alleged violation. ECF No. 15-20. They interviewed Plaintiff, reviewed a photograph taken by Mr. Pratcschler, and determined that Plaintiff had been sleeping on the job. *Id.* They also determined that Plaintiff had lied when he denied sleeping on the job in the interview. *Id.* Because Mr. Sharrow was already at the Decision Making Leave (DML) stage of discipline, the next step was termination. On December 3, 2015, Mr. Brissette provided Plaintiff a letter informing him that his employment was terminated for "inattention to job duties; sleeping on the job; as well as lying regarding this incident in a company investigation." ECF No. 15-20.

Fraud and dishonesty in connection with seeking and obtaining paid leave are legitimate, non-retaliatory reasons for adverse employment action. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 284 (6th Cir. 2012) ("fraud and dishonesty constitute lawful, non-retaliatory

bases for termination."); *Allen v. Butler Cty. Comm'rs*, 331 F. App'x 389, 395 (6th Cir. 2009) (quoting *Callison v. City of Phila.,* 430 F.3d 117, 121 (3d Cir.2005) ("Nothing in the FMLA prevents employers from ensuring that employees who are on leave from work do not abuse their leave.").

**C.**

Finally, once the employer articulates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the employer's proffered reason for the adverse decision was a pretext for unlawful retaliation. *Id.* A plaintiff can rebut the employer's proffered reason by showing that it had no basis in fact, did not actually motivate the adverse decision, or was insufficient to warrant the adverse decision. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). Although temporal proximity between the protected FMLA activity and the adverse decision can be sufficient to establish Plaintiff's prima facie case, such temporal proximity alone cannot establish pretext. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001). When evaluating the basis for the employer's decision, the employer is entitled to the benefit of the honest belief rule. *Donald*, 667 F.3d 757, 763.

Plaintiff has not provided evidence to demonstrate pretext. With respect to the decision to place him on DML, Plaintiff makes various arguments and assertions in his "statement of facts" section which could be relevant to the pretext analysis, though he does not specifically argue that the employer's decision to place him on DML was pretextual. Rather, his pretext argument is specifically directed at the termination decision. Nevertheless, the decision to place Plaintiff on DML is independently relevant to the pretext inquiry, as Plaintiff's DML status was part of the reason for his termination. The decision to place Plaintiff on DML thus requires independent consideration.

Plaintiff offered testimony regarding what he specifically did during the golf outing. He explained that did not participate in the golf outing but merely rode in the golf cart for nine holes, walked up to the green to watch his teammates putt, and walked to and from his car. Sharrow Dep. at 49. *Id.* He also testified with respect to the tubing trip that all he did was float for a few hours with his feet in cold water. *Id.* at 50. Plaintiff's explanation for his activities during his sick leave is only relevant to the extent it was shared with Ms. Nestle when she made the decision to place him on DML. Whether or not Plaintiff actually participated in the golf outing is not dispositive. Under the honest belief rule, the employer is entitled to reasonably rely on a particularized set of facts that were before it when the adverse decision was made. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

The memorandum prepared by Ms. Nestle indicates that, during their meeting, Plaintiff "admitted that he participated in the tournament." ECF No. 15-8. She also had possession of a facebook picture Plaintiff appeared in which was captioned "2015 Tim and Ed's Golf Scramble Champs."[1] *Id.* Ms. Nestle also called the golf course to confirm that the event took place the weekend of July 17, when she knew Plaintiff was out on sick leave. *Id.* Plaintiff's testimony that he did not participate in the event does not create a question of fact as to pretext because he has provided no evidence that this information was shared with Ms. Nestle. Plaintiff contends that he informed Ms. Nestle and Ms. Bluj that "he did not actively golf, but simply rode around in the car[t]." Resp. at 9. In support of this assertion, he cites to page 56 of his deposition transcript, which reads as follows:

---

[1] A golf "scramble" is a team event consisting of several teams of two or more players. Each player hits a tee shot, after which the team selects the best shot from the group. The remaining players retrieve their ball, move it to the location of the best tee shot, and all players on the team hit from that spot. This process repeats after each shot until the ball is in the hole. A scramble can be played with any number of people, though having more players provides a greater advantage, as it gives a team more shots to choose from. http://golftips.golfweek.com/play-golf-scramble-20173.html.

> *Q: Do you remember telling Ms. Bluj and Ms. Nestle that you had been at the golf tournament that weekend of July 17, 2015?*
> *A: Was I there?*
> *Q: Do you remember telling them that you were there?*
> *A: I don't remember telling them that.*
> *Q: --once they showed you the photo?*
>   *Okay. You don't –*
> *A: I don't remember telling them that, no.*
> Q: Okay. If their notes say that you told them that you had been at the golf tournament, any reason to think that's inaccurate?
> A: No.
> Q: Okay. Do you remember telling them or confirming for them that in order to participate in that golf tournament you would have had to be on your feet quite a bit?
> A: That was their opinion.
> Q: Okay. Do you remember agreeing with it?
> A: Agreeing that that was their opinion, yeah.
> Q: Do you agree that to participate you would have had to be on your feet quite a bit?
> A: No.
> Q: Okay
> *A: I said I rode around in the cart and that's what I did.*

Sharrow Dep. at 55–56 (emphasis added).

In short, Plaintiff did not testify, as he now contends, that he told Ms. Nestle and Ms. Bluj that he did not golf. Plaintiff stated "I said I rode around in the cart and that's what I did." *Id.* at 56:21. The most recent question asked prior to that statement was "Do you agree that to participate you would have had to be on your feet quite a bit.?" Thus, Plaintiff appears to be reiterating his answer from page 49 that he rode in the cart and did not play golf. He does not appear to be reporting what he said to Ms. Nestle and Ms. Bluj. Furthermore, Plaintiff testified that he did not even remember telling Ms. Nestle and Ms. Bluj that he *attended* the event. Thus, he would not have testified moments later that he in fact told them he rode around in a cart at the event. The only logical conclusion is that Plaintiff's statement at 56:21 was in response to the most recent question asked prior to the statement. That question concerned his actual activity during the event, as opposed to what he reported to Ms. Nestle and Ms. Bluj. Considering he had

already explained his activity at page 49, when he was questioned about it again he responded "I said I rode around in the cart and that's what I did."

Even if Plaintiff did in fact tell Ms. Nestle that he "rode around in a cart," this is not equivalent to telling her that he *did not play golf*. Without additional explanation, if all he told her was that he rode in a cart, the only reasonable conclusion for her to reach was that he simply rented a golf cart for his round as opposed to carrying his own bag, using a caddie, or using a pull cart. Ms. Nestle would not have reasonably concluded that he simply observed other players golfing while remaining in the cart.[2] The undisputed evidence demonstrates that Plaintiff reported to Ms. Nestle that he participated in the golf tournament, as Ms. Nestle indicated in her memorandum. ECF. No. 15-8. Plaintiff has not sufficiently called this evidence into question, and thus has not established a genuine dispute of material fact. *See Anderson*, 477 U.S. at 251–52 (noting that the Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

He also told her that he tubed the rifle river, though he did not provide any other detail concerning his conversation with Ms. Nestle about the tubing trip. *Id.* at 60. When questioned about his limitations during sick leave, he told her that he had difficulty walking or climbing stairs, and had to alternate between ice and heat applications. *Id.* at 52, 54. He disputed whether his activities were equivalent to work functions which required him to run up and down stairs, climb in and out of machines, and scrape wires. *Id.* at 61.

---

[2] The statement in Plaintiff's response brief that he "simply rode around in the car[t]" is not consistent with his previous testimony. Resp. at 9. In fact, Plaintiff testified that he also walked up to the green to watch people putt. Sharrow Dep. at 49.

Based on this information, Ms. Nestle had a sufficient factual basis to support her determination that Plaintiff's activities during his sick leave were inconsistent with the reasons he was out on sick leave and that he should be placed on DML for benefit fraud. *Id.* Ms. Nestle was under no obligation to ascertain precisely what physical activities he engaged in and compare those activities to his work functions. She was not required to determine how many golf shots Plaintiff took (if any), whether he only walked to the greens to watch people putt, or whether his tubing trip included physical activity beyond simply resting his feet in cold water for three hours. The employer's decisional process need not be optimal or leave every stone unturned so long as the employer makes a reasonably informed and considered decision. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

Ms. Nestle relied on photographic evidence and Plaintiff's own admission that he participated in the golf scramble and tubed the rifle river while he was out on leave with a sesamoid foot fracture and a knee condition. Plaintiff reported to Ms. Nestle that these conditions made it difficult to walk or climb stairs, and that he had to alternate between heat and ice applications. Sharrow Dep. at 52, 54. On this basis, she determined that his activities were inconsistent with his reasons for being out on sick leave. Plaintiff cannot create a genuine dispute of fact as to pretext by reframing his terse, undeveloped testimony concerning the information he provided to Ms. Nestle. At the pretext stage, the impetus is on Plaintiff to furnish evidence that he explained his activities to Ms. Nestle, and that his explanation provided sufficient detail to potentially undermine her conclusions and override her good faith belief that he had engaged in benefit fraud. Plaintiff has not done so.

With respect to the termination decision, Plaintiff asserts that the evidence of him allegedly napping on the job "did not actually motivate the decision and/or was too insufficient

to motivate the decision." Resp. at 21–22. Plaintiff argues that Defendant openly tolerated inattention to duties, including watching TV, reading, and taking naps. *Id.* Plaintiff also argues that "Defendant does not and cannot produce evidence that it uniformly applies its attention to duties policy." *Id.* Pretext can be demonstrated "where evidence that other employees, particularly employees not in the protected class," were not subject to an adverse decision "even though they engaged in substantially identical conduct to that which the employer contends motivated" the adverse decision. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) ((overruling on other grounds recognized by *Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir. 2009)). Plaintiff is mistaken, however, regarding who bears the burden to establish pretext. Defendant need not prove that it uniformly enforces its policies. Rather, *Plaintiff* must produce evidence that Defendant does *not* uniformly enforce its policies.

To establish pretext based on selective enforcement of Defendant's policies, Plaintiff must establish that he was treated differently than employees who aren't in the protected class, and that he was otherwise similarly situated to those employees in *all material respects. See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). The plaintiff and the comparators "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583.

Plaintiff identified four individuals who have slept on the job, including Steve Mikelychek, Mr. Pratschler (the team leader who accused Plaintiff of sleeping), Will Butterfield, and Dave Houghtaling. Notably, Plaintiff has produced no information about these employees. First and foremost, it is not clear whether these employees engaged in protected conduct. It is

entirely possible that they also requested FMLA leave, which would undercut an inference of Defendant's retaliatory intent.

Nor has Plaintiff provided any evidence that they were similarly situated in any respect other than the fact that they slept on the job. Plaintiff has provided no evidence as to whether these individuals dealt with the same supervisor. Plaintiff has provided no evidence that they were *subject to the same standards*. Plaintiff contends that the employer's policy on inattention to duty is the relevant standard. However, Plaintiff overlooks a key distinguishing detail, namely that he was on DML, the final stage in the disciplinary process prior to termination. Thus, he was not subject to the same standard as all other employees. Rather, he was subject to immediate termination for workplace misconduct. Plaintiff has not produced any evidence that the other employees he identified were also on DML. Nor has Plaintiff provided evidence that he was engaged in the same conduct as his alleged comparators. Indeed, Plaintiff was terminated not only for sleeping on the job but also for *lying about it during the company investigation*. ECF Nos. 15-19, 15-20. He has not produced evidence that other employees engaged in the same conduct.

Notably, Defendant has produced affirmative evidence that its proffered reason was *not* pretextual, even though Defendant was under no obligation to do so in order to obtain summary judgment. Defendant identified Jason Dzurka, Plaintiff's co-worker who was also caught sleeping on the job. Mr. Dzurka is the only comparator about whom any information is known. Indeed, it is difficult to imagine a more appropriate comparator than Mr. Dzurka. Neither party has suggested that Mr. Dzurka had requested FMLA leave, or otherwise engaged in any protected activity. Thus, he is outside the protected class. He was caught sleeping in the same room as Plaintiff at precisely the same time, and was discovered and reported by the same team

leader, namely Mr. Pratcshler. In fact, Plaintiff and Mr. Dzurka were sitting so close together that the picture Mr. Pratcshler took captures both of them. Mr. Dzurka was also on DML at the time of this incident, and was terminated by the same supervisor, Mr. Brissette. Brissette Aff. at ¶ 17. This tends to undermine any inference of retaliatory intent, particularly given Plaintiff's lack of affirmative evidence of pretext.

Because Plaintiff has not produced any evidence upon which a reasonable jury could conclude that Defendant's proffered reasons for the adverse decisions were pretextual, summary judgment will be granted for Defendant on Plaintiff's FMLA retaliation claim.

## IV.

The Michigan Workers Disability Compensation Act (MWDCA) provides:

> A person shall not discharge an employee or in any manner discriminate against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under this act or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act.

MCL § 418.301(13). Where, as here, a plaintiff relies on indirect evidence to support his MWDCA claim, the *McDonnel Douglas* burden shifting framework applies. *Dortman v. ACO Hardware, Inc.*, 405 F. Supp. 2d 812, 822 (E.D. Mich. 2005) (citing *Chiles v. Machine Shop, Inc.,* 238 Mich. App. 462, 470 (1999)). In order to establish a prima facie case of retaliatory discharge, a plaintiff must establish that: 1) he asserted his right to workers' compensation benefits; 2) the defendant knew that plaintiff asserted his right to workers' compensation benefits; 3) the plaintiff suffered an adverse employment action; and 4) there was a causal connection between the plaintiff's assertion of his right to workers' compensation benefits and the adverse employment action. *Id.*

Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment decision. *Id.* Once the

defendant has met this burden of production, the plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [unlawful retaliation]." *Id.*

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Claims under Michigan's Persons with Disabilities Civil Rights Act (PWDCRA), MCL § 37.1102(1), "essentially track those under [the ADA]." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014). Where, as here, a Plaintiff relies on indirect evidence to support his PWDCRA claim, the *McDonnell-Douglas* burden shifting framework applies. *Id.*

As explained above, Plaintiff has produced no evidence upon which a reasonable jury could conclude that Defendant's proffered reasons for the adverse decisions were pretextual. This finding applies with equal force to Plaintiff's MWDCA and PWDCRA claims as well. Indeed, Plaintiff offers no additional evidence of pretext to support these claims other than what was offered in support of his FMLA claim. Rather, Plaintiff's response brief contains one catch-all section labelled "pretext" which contains all of the arguments addressed above. For the same reasons explained above, Plaintiff's pretext arguments fail. Thus, even if Plaintiff could establish a prima facie case to support his MWDCA and PWDCRA claims, Defendant would still be entitled to summary judgment on all claims.

**V.**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF No. 10, is **GRANTED.**

It is further **ORDERED** that Defendant's motion to strike, ECF No. 8, is **DENIED** as moot.

It is further **ORDERED** that the complaint, ECF No. 1, is **DISMISSED.**

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: April 12, 2018

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 12, 2018.

s/Kelly Winslow
KELLY WINSLOW, Case Manager